**Affirmed and Memorandum Opinion filed June 26, 2014.**



In The

# Fourteenth Court of Appeals

## NO. 14-14-00146-CV

## IN THE INTEREST OF A.R.B., C.L.B., C.L.B. JR., AND E.B., CHILDREN

**On Appeal from the 312th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2008-51371**

## M E M O R A N D U M   O P I N I O N

Appellant, C.B. (the Father), appeals from the decree terminating his parental rights to his four children, A.R.B., C.L.B., C.L.B., Jr., and E.B. (the Children). The Father raises four issues challenging the sufficiency of the evidence to support the three predicate termination grounds and the finding that termination of the Father's parental rights is in the Children's best interest. We affirm.

### BACKGROUND

On August 27, 2008, the Texas Department of Family and Protective Services (the Department) was appointed Emergency Temporary Managing Conservator of the Children after receiving a report alleging neglectful supervision

and physical neglect by both parents. It was alleged the Children were left alone at their apartment the previous night and the seven-year-old child was found wandering the apartment grounds in the morning trying to find a ride to school. The one-bedroom apartment was filthy, had no electricity, and had spoiled, maggot-infested food in the refrigerator. At that time the Children were ages seven, five, three, and two.[1] The record reflects the Mother pled guilty to two charges of abandoning a child, and on December 5, 2008, she was placed on deferred adjudication probation for four years. The Father was also charged with abandoning and endangering his children, but the record reflects he was acquitted of the charges.[2]

Shortly after the Children were removed to the Department's care, the Father was sentenced to prison on a drug offense. The Department continued as temporary managing conservator of the Children until March 16, 2010, when an agreed decree was signed establishing the Father's paternity, naming the Department as the Children's sole permanent managing conservator, and ordering the Father to pay child support and complete certain tasks, including a twelve-step program and parenting classes, refrain from criminal activity, and submit to random drug testing. The Father did not appeal that judgment.

After entry of the agreed decree, the Mother stopped communicating with the Department, and her whereabouts were unknown. The Father remained in prison on a ten-year sentence. Accordingly, on July 6, 2010, the Department filed a motion to modify conservatorship, seeking termination of parental rights. After a

---

[1] ARB, a daughter, was born April 19, 2001; CLB, a daughter, was born July 21, 2003; CLB, Jr., a son, was born December 18, 2004, and EB, a daughter, was born November 13, 2005.

[2] There was also some testimony that these charges against the Father were dismissed. Because it is undisputed the Father was not convicted, the distinction is not material to our discussion.

trial to the court, the court signed a judgment on January 23, 2014, terminating both parents' rights.[3] The judgment recited that the Father's parental rights were terminated based on findings that termination is in the Children's best interest and that the Father committed acts establishing the predicate termination grounds set out in subsections F, N, and O of Texas Family Code Section 161.001(1). Tex. Fam. Code §§161.001(1)(F), (N), & (O); 161.001(2). The Father filed a timely motion for new trial and a timely notice of appeal.[4]

## I. BURDEN OF PROOF AND STANDARDS OF REVIEW

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In the Interest of C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

Due to the severity and permanency of the termination of parental rights, the burden of proof is heightened to the clear and convincing evidence standard. *See* Tex. Fam. Code § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will

---

[3] The parties waived any objection to trial before the Associate Judge of the 312th District Court, and they waived their right to a de novo hearing before the referring court. *See* Tex. Fam. Code §§ 201.005(b), 201.015(g). In addition, no issue is before this court concerning the deadline to enter a final order set out in Family Code Section 263.401. *See In re Dep't of Fam. & Protective Servs.*, 273 S.W.3d 637, 642 (Tex. 2009) (holding that the section 263.401(a) dismissal date is procedural, not jurisdictional). Any such issue is therefore waived. *See In re J.H.G.,* 302 S.W.3d 304, 306 (Tex. 2010).

[4] A default judgment was entered terminating the Mother's parental rights. The Mother is not a party to this appeal.

produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *accord In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

Parental rights can be terminated upon proof by clear and convincing evidence that (1) the parent has committed an act prohibited by section 161.001(1) of the Family Code; and (2) termination is in the best interest of the child. Tex. Fam. Code § 161.001(1), (2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). Only one predicate finding under section 161.001 is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

In reviewing the legal sufficiency of the evidence in a parental termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266. We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *In re J.O.A.*, 283 S.W.3d at 244; *In re J.F.C.*, 96 S.W.3d at 266.

In reviewing termination findings for factual sufficiency of the evidence, we consider and weigh all of the evidence including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. We give due deference to the fact finder's findings and we cannot substitute our own judgment

for that of the fact finder. *In re H.R.M*., 209 S.W.3d 105, 108 (Tex. 2006). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109. We are not to "second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that the court could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003) (explaining that in a termination case, an appellate court should not reweigh disputed evidence or evidence that depends on a witness's credibility).

## EVIDENCE

The trial before the court commenced October 7, 2013, and continued over several dates for almost three months.[5] Tamatha Burnett, the Department's case worker, testified the Children entered the Department's care in August 2008, and she has been assigned to this case since April 2013. At the time of trial, the Children were ages twelve, ten, eight, and seven. At that time, the Children had been in a foster home for over two years. Their current placement meets their physical and emotional needs. Records show the Children are doing well in school. The Department's goal for the Children is for them to be adopted by their current foster parents, who have expressed the desire to adopt all four of the Children. Ms. Burnett testified that she knows of no impediment that would preclude the foster family from being able to adopt the Children. The Children like their current placement and they have bonded with their foster parents and the extended family. The Children feel safe and secure in their current placement. The Children have continued individual therapy twice a month with the same therapist they have seen since they have been with this foster family. In Ms. Burnett's opinion, it would be detrimental to the Children to disrupt their current placement.

The Agreed Decree signed by the court on March 16, 2010, and naming the

---

[5] The trial was heard October 7, 2013, October 9, 2013, November 13, 2013, November 18, 2013, November 26, 2013, and January 2, 2014.

Department as the Children's sole permanent managing conservator, was admitted in evidence. In the decree, the Father was ordered to:

1. Complete a twelve-step program;
2. Complete parenting classes;
3. Provide the Department with a plan to provide for the Children's needs while he was incarcerated;
4. Refrain from engaging in criminal activity and/or drug use or associating with persons who engage in criminal activity and/or drug use;
5. Submit to random drug testing at the Department's request;
6. Pay child support according to the Attorney General's guidelines; and
7. Have visitation with the Children when mutually agreed with the Department.

The Father's criminal records were also admitted in evidence. These records show that in 2006, he received deferred adjudication probation for possession with intent to deliver cocaine. The Father was arrested again on September 24, 2008, shortly after the Children were removed to the Department's care, for possession with intent to deliver cocaine. On March 3, 2010, the Father's probation was revoked due to a positive drug test and he was sentenced to ten years in prison. The second cocaine charge was dismissed as part of the Father's conviction and sentence. The Father was in prison from September 24, 2008 until approximately July 1, 2011, when he was released on parole. His parole extends until August 2018. The Father's parole records, which included his criminal history, were also introduced into evidence. These records showed that shortly before the oldest child was born, in 2001, the Father committed theft and was convicted the next year after he pled guilty. In addition, the records show the Father was placed on probation for arson in 1993, but his probation was revoked in 1994, and he was sentenced to three years in prison. The records also show several misdemeanor

convictions for evading arrest, failure to identify a fugitive from justice, and assault.

Records were also admitted in evidence showing the Father was arrested again during the pendency of this case, on October 14, 2012, for possession of cocaine. Arrest records reflected that the Father was arrested while driving with a female passenger at about 4:50 a.m. The passenger told the officer the Father handed her a package and "demanded" she throw it out of the vehicle. The officer later recovered two clear plastic baggies containing a white powdery substance believed to be cocaine. According to the officer's report, the Father denied any knowledge about the package or its contents. According to the Father, he had been at a sports bar watching a fight. After the fight, he took an intoxicated female acquaintance to Denny's. The Father and the woman left the restaurant after a verbal altercation with staff and customers, and they were pulled over a short distance from the restaurant. The female denied that she had been involved in the dispute at Denny's and the officer let the Father drive off. After being told by those at Denny's that the female passenger was indeed involved, the officer stopped the Father's car again. According to the Father, the female threw a cigarette package containing cocaine out of the window. Testimony reflected that the Father spent almost three months in jail after this arrest before he was released on a $50,000 bond. Ms. Burnett testified that to her knowledge, the criminal case for that arrest was still pending when she testified on October 7, 2013. The Father later testified that this charge was dismissed shortly before his testimony on November 13, 2013.

Ms. Burnett testified that the Department has concerns about the Children being placed with the Father. She said that being in the Father's care would impair their emotional welfare because they would lack stability. Continuity and stability are some of the most important considerations for children. She said some of the Father's visits have been rescheduled when the Father said he could not be there,

and that "bothered the kids." Ms. Burnett also acknowledged that the Department is concerned about the Father's frequent interaction with law enforcement, and that is a concern the Children share. She testified the Father has not shown that he is capable of providing stability. Ms. Burnett testified that the Children were waiting for the Father's visit the day he was incarcerated the most recent time in October of 2012. He had promised to take the three girls to get their hair done because the oldest had a recital the next day. Ms. Burnett testified that the Father's visits were stopped after that arrest. Ms. Burnett also testified that the Department's plan for reunification of the Children with their Father ended when the Father was incarcerated in October of 2012, after his arrest for drug possession. Ms. Burnett recommended the Father's rights be terminated. In her opinion, the Father's conduct during these proceedings does not reflect safety, security or stability for the Children. She testified the Children want to be adopted and have their names changed.

Ms. Burnett has met the Father once, when he came to her office, and she has spoken to him on the phone "a couple of times." She explained that when she was assigned the case in April 2013, she sent letters to the Father and his attorney introducing herself as the new case worker. Ms. Burnett testified that she first began trying to reach the Father shortly after she was assigned the case, but he did not return her call until July, even though he acknowledged receiving her message. One of the Department's requirements in all service plans is for the parent to maintain contact with the Department. Ms. Burnett testified the Father failed to keep regular contact with her. She testified that her phone conversations with the Father in September of 2013 related to the Department's requirement that the Father undergo drug testing. The Father complied, and the September 2013 drug test results were negative.

On July 10, 2013, when the Father came to the Department's office, Ms.

8

Burnett went over the Father's family service plan with him. The Father's service plan filed with the court on February 9, 2012, was admitted in evidence. The service plan contains the Father's signature and in it he acknowledges that he was given a copy of the plan on January 18, 2012. The court then signed an order approving the service plan and incorporating it as part of the court's order. The tasks and services assigned to the Father were:

1. Sign a release allowing the Department to obtain his probation records;
2. Abstain from criminal conduct throughout the proceedings;
3. Complete a psychosocial assessment and follow all recommendations;
4. Engage in individual and family therapy, establish appropriate support systems, and demonstrate an ability to utilize community resources;
5. Maintain suitable housing that is clean, stable, and free from safety hazards for six consecutive months, and provide a copy of his lease;
6. Develop and work on a realistic education and/or job skill plan, budget, and plan for the care and protection of his children, including providing proof of employment demonstrating his financial ability to provide for his children, and maintain stable employment for at least six months;
7. Submit to random drug testing; and
8. Pay child support based on the Attorney General Guidelines.
9. Visitation with the Children in a therapeutic setting until the next review in February 2012.

The plan reflected that the previously ordered twelve-step program, parenting class, and plan for providing for the Children during the Father's incarceration were no longer required. The Father also signed a release for his parole records, and they were provided to the Department.

By order signed September 29, 2011, the Father's child support was set at $389.48 per month, beginning September 1, 2011. Ms. Burnett testified that while the child support was withheld from the Father's wages, he had not been employed regularly and he was in arrears on his payments. She testified that the Father has

9

not had stable employment for at least six continuous months. She testified that when she met with the Father in July, he had just gotten a job at "the 99-cent store." Ms. Burnett testified the Father is not financially able to take care of four children. She testified that the Father has also not obtained stable housing as required by his plan. The Father lives with his fiancée and her three children in Katy, but Ms. Burnett had not visited that home. She requested a copy of a lease or mortgage document with his name on it, but the Father has not provided it. Even though the Father has lived there over six months, the Department does not consider the arrangement stable because the Father is not on a lease or mortgage and could be required to leave at any time.

Before the Father's incarceration in October of 2012, the Father and the Children were engaged in family therapy. After his arrest, Ms. Burnett testified the court suspended the Father's visitation with the Children, including his participation in family therapy. The Father has not had contact with the children since his arrest more than six months earlier. Ms. Burnett testified the Father did not seek to continue family therapy after his release from jail.

The previous case worker, Kelly Derouen, also testified. She was assigned the case in 2008, shortly after it was initiated, until March of 2013, when she left the Department's employ. She testified that the parents were supposed to complete certain tasks set out in the 2010 agreed decree. When the Mother stopped contact with the Department, the Children were placed with relatives. There were problems with that placement. In May of 2010, the Children were removed and placed with their current foster parents.

Ms. Derouen testified the Department originally had been working toward reunifying the parents with the Children. After the Mother disappeared and the Father was convicted on a drug charge and sentenced to ten years in prison, the Department brought its modification action seeking termination of their parental

rights if reunification could not be achieved. Ms. Derouen testified that after the Father was released from prison in 2011, she had many conversations with him about what he would be required to do to remain a part of the Children's lives. The Father requested visitation, and the court ordered visitation to begin with the oldest child in November of 2011. Visitation began in a therapeutic setting, and the Children's therapist determined whether additional visits, including visits with the other Children, were appropriate. By the summer of 2012, the Father was seeing all four Children. The Father continued these visits, with encouragement and assistance from the foster parents, until he was arrested in October of 2012. Ms. Derouen believed the court had ordered the visits stopped and the Father had no further visits with the Children after his arrest. The record does not contain an order prohibiting the Father's visits. Ms. Derouen also testified the Children have issues with abandonment because it was a pattern they experienced with their parents. Their fear of being left alone is being addressed in therapy, and they have not fully recovered from their earlier trauma, although they are much better.

The trial court interviewed, in chambers, the oldest child, who was then over twelve years old. *See* Tex. Fam. Code § 153.009 (setting out procedures for interviewing a child in chambers). We have reviewed the record of that interview, and will briefly discuss the child's interview. *Id.* at § 153.009(f) (providing that the record of a child's interview is part of the record in the case). The oldest child described her Father as the "promisor," who "promised a lot of things," but "broke" his promises and did "not usually come through." In contrast, she described her foster father as the "protector," stating "he makes me feel safe." She referred to her foster mom as "awesome," and said she encourages the Children to live out their dreams and to go to college. When asked what she wants for the future, she responded that she wanted to live with her foster parents until she goes to college. She wants to be adopted by her foster parents and for all the Children to

11

have the foster parents' last name. The twelve-year-old answered, "No, not really," when asked if she wanted to see her Father. She shared a journal she kept when she first resumed visits with her Father after his release from prison. She wrote:

> Number one says for the parents: Don't leave us alone anymore. Number two, no more drugs/smoking. Go to church where I can participate with the Bible. . . . House cleaned. Get better babysitters. No more going to jail. Family meetings. Take care of us better. Get us a home to live in.

When the trial resumed, the Father testified. He said he had been working at the 99-Cent Store since April 2013, made $7.52 an hour, and worked 25 to 30 hours a week. The Father acknowledged that he had also earned about $2,000 selling Mary Kay products in recent months. He acknowledged that he was behind on his child support, but he did not know how much he owed. The Father admitted that he had been ordered to pay child support since September 2011, and he acknowledged that there were several months where he made no payments. Records admitted at trial show that since the entry of the child support order until November 12, 2013, the Father paid $5,059.03 of the $10,760.17 due, with a balance owed of $5,701.14. The Father also admitted he had paid his criminal defense attorney $7,500 while this case was pending. He had also purchased a truck recently for $10,000 and had made one $400 payment on it. He acknowledged that his car payment is more than his child support.

The Father testified about the Children's removal from the apartment in 2008. He testified that at that time, he had broken up with the Children's Mother and was spending time with a new girlfriend. He acknowledged that the Mother was using drugs. He also admitted she had been using drugs, including marijuana, antidepressants, "pills," and cocaine, since he met her in 1998. The Father testified that after the electricity in the apartment was turned off, he moved the Children to a motel room. He testified that the night the Children were left alone, the Mother

12

called him and said she could not take off work. The Children were at the apartment, apparently because a babysitter who also lived at the complex was ill and could not care for them. The Father testified he went to the apartment after 10:00 p.m. that night and then bought groceries and cleaning supplies. He fixed the Children dinner and put them to bed in pallets on the sofa and chairs. He began cleaning the apartment, but left around one in the morning to spend time with his girlfriend. The next morning, he learned that the police were at the apartment because the Children had been left there alone. By the time the Father reached the apartment, the Children had been removed by Children's Protective Services (CPS) and taken to a medical center for evaluation and treatment. Although the Father claimed he no longer lived at the apartment at that time, the Department's records admitted at trial reflect that the Father's medication bottles and men's clothing were at the apartment, and the Father's name was on the lease.

The Father acknowledged that he sold illegal drugs, including cocaine, methamphetamine, and ecstasy, for profit between 2006 and 2008, while he was on deferred adjudication probation. The Father denied ever selling drugs out of the home. The Father claimed he has never used illegal drugs. He explained a positive drug test on August 27, 2008, by stating he found cocaine on the counter at the apartment and cleaned it off with his hand.

The Father testified that, in addition to the four children in this case, he has another daughter born in 2004 that he does not see or support. He denied having other children, but later admitted that he has two younger sons, ages seven and eight. He then denied that they were his biological children. He later stated he was not sure if the boys were his children and no DNA testing had been done. He acknowledged that he had not seen the two boys since before 2008.

Although the Father wanted custody of the Children, he had made few plans to prepare for them. The Father saw no problem adding four more children to the

13

household in addition to his fiancée's three children. The Father's "Family Plan" was admitted. The plan lists the Children's schools, the "House Rules," "chores," and an available clinic and dental office that will accept CHIP or Medicaid. He also outlined his plan for the sleeping arrangements for seven children in his fiancée's home if his Children were returned to him. The Father also provided the court a Financial Information Statement setting out a budget. The Father claimed he had a stable relationship with his fiancée, but he was waiting on the outcome of this case before getting married. If he and the fiancée broke up, he would rely on friends and family to help him care for his Children.

The Children's foster mother testified next. The Children have lived with her since May 1, 2010, about three and a half years at the time of trial. She described the Children's problems when they first came into her care. The two youngest children, then almost five and six, were not fully potty-trained, and had frequent accidents. The foster mother also described the Children's progress and that they were doing well in school. She also described how upset the Children were when their Father was unable to visit them in October 2012, and the girls had to miss a scheduled hair appointment. The Father also missed the oldest child's recital the next day. The Father's fiancée texted the foster mother and claimed they were unavailable due to an emergency with her father. When her further texts and calls were not returned, the foster mother checked public records and learned the Father had been arrested. When the Children later learned of the arrest from their therapist, they were visibly upset and crying. All of the Children subsequently had behavior problems at school.

The foster mother testified that she and her husband want to adopt the Children who already refer to the foster parents as "mommy" and "daddy." The foster mother acknowledged that initially they did not plan on adoption. When they understood the Father would be in prison a long time, they first considered

14

adoption. In the summer of 2011, however, they learned that the Father had been released and wanted to regain custody of the Children. Therefore, they chose not to pursue adoption at that time. In January of 2014, they understood that the Department no longer considered reunification with the Father appropriate, so the foster parents began the adoption paperwork. Finally, the foster mother testified that she does not believe the Father appreciates what the Children have been through. She noted that he simply stated, "Kids are resilient. They'll get over it."

Dr. Felicia Powell-Williams testified as an expert on behalf of the Department. She has been the Children's therapist since 2009 or 2010, when the Children were placed in their current foster home. She provides individual and family psychotherapy, including play therapy to help the Children deal with "early trauma" and "multiple life changes." She testified that when she first began seeing the Children, they expressed "a great deal of anxiety, worry about what was going to happen, and in their daily lives, where would they stay, who would care for them, their fear that they would be hurt or harmed." Dr. Williams further testified, "There was a lot of anger, a lot of difficulty with sleep patterns, and to where some would stay — some of the children would stay up throughout the night."

In discussing the oldest child, who was age seven when she entered the Department's care, Dr. Williams testified, "She wanted to parent the children and keep them contained under her control. She was very fearful of others coming in and guiding them and directing them on what to do. She was not very trusting of others. She was very angry that she had to be a care — she was very angry and worried about not having parents available for her."

The five-year-old girl "was very depressed, very insecure, very easily distracted, required constant redirection and reassurance." She had nervous "tics." The four-year-old boy "would wet the bed. There would be moments where [he] would have bowel control difficulties. He struggled with trust and being able to

15

socially engage with others." He also had a fear of running water. The youngest child, almost three years old, when she entered State care, "appeared to be very disorganized in her thoughts, hyperactive, impulsive, required constant redirection in order to stay within appropriate boundaries."

In November of 2012, Dr. Williams explained to the Children that the Father would be unable to attend family counseling sessions as scheduled. At first she did not give the Children the reason, but she then told them that their Father had been arrested and was in jail. She said it was important for them to know about it because of their work in family therapy. "They had a list of questions that they would ask him each session and one of the things that were on the list is that he would not break the law nor would he return to jail and as there would be moments where in the family session he may be late and they would become very anxious and would worry about 'did something happen? Is he in jail again?'" She also stated it was important for her to tell the Children the truth to maintain their trust.

When Dr. Williams informed the Children that their Father was in jail, the Children "appeared to be disappointed, sad." Therapy sessions were increased to address the Children's issues. The oldest child "became very angry. She became physically aggressive towards her siblings. At one point she threw down one of her sisters. She would become very territorial and yell and become very controlling and disrespectful to others." The other Children had recurrences of their earlier issues that had seen improvement since they first began treatment. The boy changed his name at school and he "had quite a few physical altercations on the bus and at school during that time."

Dr. Williams was concerned that the Father's October 2012 arrest and time in jail were emotionally harmful to the Children because "it disrupted the work that was going on with the children in their ability to begin working on trust. It was very difficult for them and it was, you know, it was just a major disruption for the

therapy altogether for them to be able to explore those things and it was kind of a resurfacing of memory for them of being abandoned and him not being available and seeing them as a priority."

During the preceding eight to ten months, Dr. Williams increased the amount of time she saw the Children each month because they wanted to explore their long-term placement, including the possibility of adoption. She testified that at the time of trial, "The children are very — emotionally they appear to be very emotionally stable and working towards more self-control and regulation. They are very focused on what their future will look like and the desire to have a great deal of control over making those decisions about their future." When asked for her observation about the Children's foster home, Dr. Williams testified, "my observation about the home is that they seem to have a very clear routine. The children know what to expect. They understand the parental roles that exist within the home. They seem to be securely attached to the foster parents, have established a great deal of trust and seem to be doing well and are reassured and cared for."

In Dr. Williams's opinion, placement with their foster parents would be "appropriate" for the Children and adoption would be in their best interest. In her opinion, placement with their Father would not be in their best interest and would be "very detrimental to the children and their emotional well-being." Dr. Williams went on to state, "it would be re-traumatizing in the sense that the children have formed the ability to have the trust and the security at this time in their placement. There would be a complete disruption emotionally for them to where it would cause even more of a disruption with repeated behaviors. It would position [the oldest child] in a more parentified [*sic*] role. It would resurface the fear and the insecurities that the children have had or have expressed in the past."

The Child Advocates volunteer, Jill Ritter, also testified. She has been involved with the Children since March of 2012. The Children's current placement

is a good place, meeting all of their needs. She has met the Father once and had several phone calls with him. Ms. Ritter testified Child Advocates recommends, based on her evaluations, that his rights be terminated because "the children's emotional stability is the core issue to me. They're doing very well where they are, and they've built up a relationship with the [foster parents.]" The Children should not be returned to the Father because "it would be another really big upheaval in their life," and "they feel good and safe where they are." The Father's behavior the night he was arrested in October of 2012 "shows a lack of priorities that he has."

A Harris County Sheriff's deputy, Officer Kent Mangum, testified that he was familiar with the 2008 incident that brought the Children into the Department's care. He testified that he learned the oldest child had gotten a ride to school and asked the school nurse to check on her sisters and brother because they were home alone. Law enforcement was alerted, and Officer Mangum was one of the responding officers who went to the apartment that morning. Officer Mangum picked up the oldest child from school, and the officers called Emergency Medical Services (EMS) to transport the Children to the hospital. Officer Mangum spoke to the Father on the phone, and he said he could be there in thirty minutes. The officers were at the scene for another forty-five minutes to an hour, but the Father did not arrive. Photographs showing the condition of the apartment were admitted in evidence.

Finally, the Father's fiancée testified. She stated she lives in a four-bedroom home in Katy with the Father and her three girls: eight-year-old twins and a nine-year-old. The fiancée testified that she has been a teacher for seven years and has an annual income of $38,000. She testified that she has been engaged to the Father since February, but they are waiting to marry until these Children can be there. She testified the Father works about 15 hours a week at the 99-Cent Store and he also sells Mary Kay products. She said he contributes to the household expenses and

helps pay the mortgage. The fiancée testified that once she and the Father are married, she can add the Children to her health insurance. She acknowledged she was aware of the Father's criminal history, including seventeen different offenses over a twenty-year period. She knew the Father had sold drugs, and she was aware the Father is on parole. She also admitted she knew about the Father's positive drug test. She testified she is not concerned about him getting into trouble again.

## ANALYSIS

### A. Section 161.001(1)(O)

In his third issue, the Father asserts the evidence is legally and factually insufficient to support the trial court's predicate termination finding under section 161.001(1)(O), which provides termination is warranted if the trial court finds by clear and convincing evidence that the parent has:

> (O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child;

Tex. Fam. Code § 161.001(1)(O).

The Father has not challenged the findings supporting the portion of subsection O requiring the Children to have been in the temporary managing conservatorship of the Department for not less than nine months as a result of their removal under Chapter 262 for abuse or neglect. *See id.* The evidence conclusively established the Children were in the Department's care for five years after being removed from the home due to abuse or neglect. *See In re E.C.R.*, 402 S.W.3d 239, 248–49 (Tex. 2013) (clarifying that "abuse or neglect of the child" in subsection O necessarily includes the risks or threats from the environment in which the child is

19

placed).

Subsection O does not require that the parent who failed to comply with a court order be the same person whose abuse or neglect of the children warranted the children's removal. *See In re S.N.*, 287 S.W.3d 183, 188 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("Had the legislature intended such a requirement, it could have easily provided that conservatorship be 'as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child by the parent.'"). Therefore, it is immaterial that only the Mother was convicted of child abandonment.

First, the Agreed Decree signed by the court on March 16, 2010, among other matters, ordered the Father to pay child support. The Father also signed a family service plan on January 18, 2012, which also required the Father to pay child support according to the Attorney General's guidelines. The Father acknowledged that he understood the purpose of the plan. The trial court signed orders approving and incorporating the plan at subsequent placement review hearings. The trial court also signed a separate order requiring the Father to pay $389.48 per month in child support, beginning September 1, 2011. Records were admitted at trial showing the Father has paid less than half of his child support. The Father paid $5,059.03 of the $10,760.17 due, with a balance owed of $5,701.14. The Father acknowledged that he was behind in paying his child support, and there were several months when he made no payments. The Texas Supreme Court has made it clear that failure to pay child support as required in an order for reunification can be evidence in support of a finding of a material violation under subsection O. *See In re J.F.C.,* 96 S.W.3d at 278.

The family service plan incorporated in the court's orders required the Father to refrain from criminal activity. The Agreed Decree also ordered the Father to "[r]efrain from engaging in criminal activity and/or drug use or associating with

persons who engage in criminal activity and/or drug use." The Father was arrested again during the pendency of this case, on October 14, 2012, for possession of cocaine. The trial court may have disbelieved the Father's story and believed the police report indicating the cocaine was the Father's. Even if the court believed the Father's testimony that the cocaine belonged to his female passenger, the Father was "associating" with a person who was selling or using illegal drugs. We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the fact finder's province. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). When credibility issues appear in the appellate record, we defer to the fact finder's determinations as long as they are not unreasonable. *Id.*

In addition to imposing the requirements to pay child support and refrain from criminal activity, the family service plan required the Father to:

> Develop and work on a realistic education and/or job skill plan, budget, and plan for the care and protection of his children, including providing proof of employment demonstrating his financial ability to provide for his children, and maintain stable employment for at least six months.

The Department's caseworker, Ms. Burnett, testified that the Father has not had stable employment for at least six continuous months. As part of the requirement for stable employment, the Father was required to "provide proof of employment or a letter from his employer indicating his pay and hours and demonstrate that he is financially capable of providing for his child[ren]." The Father had not provided any documentation. Although he had a job at "the 99-cent store," the Father testified he only worked about 25 to 30 hours a week, and was paid slightly more than minimum wage. He also admitted to the caseworker that he obtained the job June 26, 2013, less than six months before trial. While he later stated he began work in April, the 2013 child support records and the Father's own testimony do not support that claim. The Father acknowledged that his wages were

garnished, but less than $40 in child support was paid in April and May, and no payments were made in June. The Father seemed to acknowledge that his income from the 99-Cent Store was insufficient because he testified he was looking for another job. His fiancée testified the Father only worked 15 hours a week and he could not get another job because he cared for her children while she was at work. Ms. Burnett testified the Father is not financially able to take care of four children.

The Father also cited his income from selling Mary Kay products. In his testimony in November 2013, the Father stated, "I guess over the last two months" his income was about $2,000, but on his financial statement, he estimated $200 per month from Mary Kay. His financial statement estimated $416 per month from the 99-Cent Store, based on 15 hours per week, but no allowance was shown for withholding or any other deductions. He acknowledged that he did not use these earnings to support his four Children.

The Father's court-ordered family service plan required him to "[m]aintain suitable housing that is clean, stable, and free from safety hazards for six consecutive months, and provide a copy of his lease." Ms. Burnett testified that the Father did not comply with this requirement. She requested a copy of a lease or mortgage document with his name on it, but the Father never provided one. The Father acknowledged that his name is not on the mortgage for the home and his fiancée pays the mortgage. Even though the Father has lived with his fiancée for over six months, the Department does not consider the arrangement stable because the Father is not on a lease or mortgage and could be required to leave at any time. The Father admitted that if he and the fiancée broke up, he would have to depend on family and friends for support. Moreover, even substantial compliance with a family service plan is insufficient to avoid a termination finding under subsection O. *In re C.M.C.*, 273 S.W.3d at 875; *see also In re T.T.*, 228 S.W.3d 312, 319–20 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (noting Texas courts have

22

uniformly found substantial compliance with the provisions of a court order inadequate to avoid a termination finding under subsection O).

The Father was also required pursuant to the court-ordered family plans to maintain contact with the Department and "immediately" advise it of any change of address or living circumstances. Ms. Burnett testified the Father failed to keep in regular contact with her. It is undisputed that the Father failed to advise the Department of his whereabouts when he was arrested in October 2012, or that a few months later, he was released on bond.

In addition, Ms. Burnett testified the Father did not continue court-ordered family therapy after his arrest in 2012. The Father acknowledged that the therapy stopped, but claimed that his visits with the Children were stopped by court order. Ms. Burnett testified that the Father could have continued family therapy, but that the Department would no longer pay for his participation. The Family Code does not allow consideration of excuses for non-compliance with section 161.001(1)(O). *See In re M.C.G.*, 329 S.W.3d 674, 675–76 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). Sporadic incidents of partial compliance with court-ordered family service plans do not alter the undisputed fact that the parent violated many material provisions of the trial court's orders. *See In re J.F.C.*, 96 S.W.3d at 278.

Reviewing all the evidence in the light most favorable to the termination findings, we conclude that a reasonable fact finder could have formed a firm belief or conviction as to the truth of the termination findings under section 161.001(1)(O). In light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the termination finding under section 161.001(1)(O) is not so significant that a fact finder could not reasonably have formed a firm belief or conviction as to the truth of the termination finding under section 161.001(1)(O). *See In re H.R.M.*, 209 S.W.3d at 108.

In sum, under the applicable standards of review, the record evidence is legally and factually sufficient to support the finding that the Father failed to comply with the provisions of a court order specifically establishing the actions necessary for him to obtain the return of the Children. *See In re T.T.,* 228 S.W.3d at 320–21 (holding the evidence was legally and factually sufficient to support termination under section 161.001(1)(O) where parents failed to complete their court-ordered services or comply with the trial court's order specifically establishing the actions necessary for the children to be returned). We overrule the Father's third issue.

The Father also has challenged the sufficiency of the evidence supporting the other predicate findings under subsections F and N of section 161.001(1). Because a single predicate finding under section 161.001(1) of the Family Code is sufficient to support a judgment of termination when there is also a finding that termination is in the child's best interest, we need not address the Father's first and second issues. *See In re A.V.,* 113 S.W.3d at 362 (affirming termination decree based on one predicate without reaching second predicate found by fact finder and challenged by appellant); *In re U.P.,* 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (affirming termination decree based on single predicate under section 161.001(1)).

## B. Best Interest

In his fourth issue, the Father challenges the sufficiency of the evidence supporting the trial court's finding that termination of his parental rights is in the Children's best interest. There is a strong presumption that the best interest of a child is served by keeping the child with his or her natural parent. *In re R.R.,* 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.,* 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam.

24

Code § 263.307(a).

The following factors, among others, should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment: the child's age and physical and mental vulnerabilities; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities. Tex. Fam. Code § 263.307(b); *R.R.,* 209 S.W.3d at 116.

In addition, courts may consider other nonexclusive factors in reviewing the sufficiency of the evidence to support the best interest finding, a court examines several factors, including (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). This list is not exhaustive, and evidence is not required on all of these *Holley* factors to support a finding terminating a parent's rights. *Id.*; *In re D.R.A.*, 374 S.W.3d at 533. With these considerations in mind, we review the evidence.

Evidence supporting termination under one of the grounds listed in section

161.001(1) can also be considered in support of a finding that termination is in the best interest of the Children. *See In re C.H.*, 89 S.W.3d at 27 (holding the same evidence may be probative of both section 161.001(1) grounds and best interest); *see also In re E.C.R.*, 402 S.W.3d at 249 ("Many of the reasons supporting termination under subsection O also support the trial court's best interest finding."). In determining the best interest of a child in termination of parental rights proceedings, the trial court may properly consider that the parent did not comply with the court-ordered service plan for reunification with the Children. *In re E.A.F.,* 424 S.W.3d 742*,* 752 (Tex. App.—Houston [14th Dist.] 2014, pet. filed). In the opinion of the Department's case worker, Ms. Burnett, the Father's conduct during these proceedings does not reflect safety, security or stability for the Children. The trial court may reasonably have considered the Father's failure to comply with his court-ordered requirements in evaluating his future abilities as a parent.

We next address the evidence of the Children's wishes and the stability of their proposed placement. The Department's caseworker, the Children's therapist, the Child Advocate, and the foster mother all testified that the Children would benefit from the safety and stability provided in their current placement. The foster parents want to adopt the Children. The oldest child told the court the Children want to be adopted and they feel safe with their foster parents. Ms. Burnett confirmed that she regularly talks with the Children and they confirmed they want to be adopted and have their names changed. She testified the Children love their current placement, and they feel secure. The Children are doing well with their foster parents, but they seek permanence after being in the Department's care for five years.

In evaluating the Father's ability to care for the Children and provide them with a safe home in the future, the evidence demonstrated his lack of definite plans

and financial inability to support the Children. Ms. Burnett testified it would be detrimental for the Children to be with their Father because of his unstable environment. The Children's therapist testified about their fear of abandonment. In her opinion, returning the Children to the Father would be "very detrimental to the children and their emotional well-being." The Father wanted to be a part of his Children's lives, but as his oldest daughter observed, he did not follow through on his promises. The Father acknowledged he depends on his fiancée, and if the relationship ended, he would have to rely on friends and family for support. He spoke generally about furthering his education, continuing to work and pay his child support arrearage, but he offered no definite steps he would take to provide for his Children. Evidence also showed the Father has not continued family therapy in support of the Children's emotional needs, and he appeared dismissive about the seriousness of the trauma the Children had been through, stating they would "get over it." While he acknowledged the Children had been in therapy for two years and would need to continue therapy, he had not looked for a therapist or made plans for providing therapy if he were reunited with the Children.

Evidence at trial established the Father's pattern of criminal and irresponsible behaviors. The court, as the fact finder, may have considered the Father's pattern of behavior in evaluating his ability to provide the Children with a safe home. The Father acknowledged he provided "day to day" parenting duties during the time before the Children were removed to the Department's care. The horrific conditions in which the Children were found when they were left home alone in 2008 provide strong evidence of the Father's inability to care for the Children. A "parent's past behavior is indicative of the quality of future care that the parent is capable of providing." *In re C.J.*, No. 14-07-00838-CV, 2008 WL 447687, at *5 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (mem. op.). In addition, the court may have relied on the Father's long criminal history as a factor

in favor of termination. *See In re S.M.L.*, 171 S.W.3d 472, 479 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (observing that incarcerated parent's absence from the child's daily life, inability to support the child, and parent's commission of criminal acts subjecting him to possibility of incarceration can negatively impact the child's emotional well-being and are factors supporting termination). The Father admitted he spent about five years in jail and had been arrested approximately seven times since the oldest child's birth. He admitted he sold illegal drugs after the Children were born. The Father acknowledged he knew about the Mother's drug use while she cared for the Children. The Father tested positive for cocaine shortly after this case began, and his deferred adjudication probation was revoked. The trial court may have disbelieved the Father's explanation that the positive test was the result of his wiping cocaine off the counter with his hand. The Father was arrested and jailed for possession of cocaine in 2012. The Father also had a pattern of criminal behavior before the Children were born. This evidence weighs heavily in favor of parental termination being in the Children's best interest because of the Father's instability and its impact on the Children's well-being, and the great possibility of future danger.

We may also consider appellant's past performance as a parent—apart from his criminal history—in evaluating his fitness to provide for the Children and the trial court's determination that termination would be in the Children's best interest. *See In re C.H.*, 89 S.W.3d at 28. A parent's failure to care for or know the whereabouts of their other children provides evidence that bears on that parent's fitness to parent a child. *See id.* The record reflects the Father has a daughter he does not see or support. In addition, there was testimony the Father has two sons that he has not seen in years and does not support. The Father's testimony is inconsistent about whether he is actually the boys' father. At first he denied he had other children besides these four Children and the daughter he does not see. He

later admitted he had two other sons, but he stated no DNA tests were performed.

In sum, the record contains sufficient evidence to support the best interest finding based on the Father's criminal history, incarceration during much of the Children's lives, and failure to fully comply with the court-ordered services for reunification. Viewing all the evidence in the light most favorable to the judgment, we conclude that a fact finder could have formed a firm belief or conviction that termination of the Father's parental rights is in the Children's best interest. *See J.F.C.*, 96 S.W.3d at 265–66. Considering the same evidence in a neutral light, we conclude the disputed evidence is not so significant as to prevent a trier of fact from forming a firm belief or conviction that termination of the Father's parental rights is in the Children's best interest. After considering the relevant factors under the appropriate standards of review, we hold the evidence is legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship is in the Children's best interest. *See* Tex. Fam. Code § 161.001(2). Therefore, we overrule the Father's fourth issue.

## CONCLUSION

Having found legally and factually sufficient evidence to support the trial court's finding of at least one predicate ground under section 161.001(1) and that termination of the Father's parental rights is in the Children's best interest under section 161.001(2), we order the trial court's judgment affirmed.

/s/    John Donovan
       Justice

Panel consists of Chief Justice Frost and Justices Donovan and Brown.